UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                          )
BINYAMIN I. EFREOM, et al.,               )
                                          )
         Plaintiffs,                      )
                                          )
    v.                                    )    C.A. No. WES 20-122
                                          )
DANIEL J. MCKEE, in his capacity          )
as Governor of Rhode Island,              )
et al.,                                   )
                                          )
         Defendants.                      )
_____)

**MEMORANDUM AND ORDER**

WILLIAM E. SMITH, District Judge.

    49 members of the Employees' Retirement System of the State
of Rhode Island claim that reductions in their pension benefits
are unconstitutional.  Defendants seek dismissal, arguing, inter
alia, that the claims are barred by res judicata and the Rooker-
Feldman doctrine.  For the reasons that follow, Defendants' Motion
to Dismiss, ECF No. 9, is GRANTED.

I.   BACKGROUND[1]

    The Employees' Retirement System of the State of Rhode Island
("ERSRI") provides retirement benefits to various state and
municipal employees in Rhode Island.  See Compl. ¶¶ 27, 29, 30,

---

    [1] For the purposes of this decision, the factual allegations
in Plaintiffs' Complaint are accepted as true.  See Shay v.
Walters, 702 F.3d 76, 79 (1st Cir. 2012) (citation omitted).

ECF No. 1.  Employees make mandatory contributions and receive benefits after retirement.  See id. ¶¶ 29-31.  Prior to 2011, retirees received a yearly, three-percent, compounded cost-of-living adjustment ("COLA").  Id. ¶ 32.  Plaintiffs allege that the State had promised to pay this COLA for the rest of their lives. Id. ¶ 32.

In 2011, the Rhode Island General Assembly passed the Rhode Island Retirement Security Act ("RIRSA").  Compl. ¶ 39.  RIRSA provided that, until ERSRI and other retirement funds reached eighty-percent funding (based on actuarial estimates of future revenue and liability), the fund would provide a COLA once every five years (instead of yearly).  Id. ¶ 44.  When eighty-percent funding was reached, retirees would receive a yearly non-compounded COLA, ranging between zero and four percent, applicable only to the first $25,000[2] of each retiree's yearly benefit.  Id. ¶ 45; R.I. Gen. Laws § 36-10-35(g)(1).

Several lawsuits were filed.  See R.I. Pub. Emples. Retiree Coal. v. Raimondo, No. PC 15-1468, 2015 WL 3648161, at *3-4 (R.I. Super. June 9, 2015) ("RIPERC II") (describing various actions).[3]

---

[2] That maximum amount was subject to small increases over time.  R.I. Gen. Laws Ann. § 36-10-35(g)(1).

[3] The Court will use the names "RIPERC I", "RIPERC II", and "RIPERC III" to refer to the Superior Court's decisions granting preliminary approval, final approval, and final judgment, respectively.  Those three decisions were all part of the same proceeding.

One suit, the so-called Clifford case, was filed by a group that included all Plaintiffs here. See Fourth Am. Compl. at 4-22, Clifford v. Raimondo, No. KC 14-0345, (R.I. Super. Jan. 14, 2015) (filed here as ECF No. 10-1).[4] These suits claimed that RIRSA's COLA reductions violated the rights of ERSRI members under the Rhode Island Constitution. See id. at 38-42; RIPERC II, 2015 WL 3648161, at *3-4. A global settlement agreement was reached between many parties in the various actions (but not Plaintiffs here), and a class action complaint was filed for settlement purposes. See RIPERC II, 2015 WL 3648161, at *2.[5] The court certified the following class:

> All persons (and/or their beneficiaries) who, on or before July 1, 2015, are receiving benefits or are participating in the State Employees, Teachers, or Municipal Employees retirement systems administered by

---

[4] See also Pls.' Opp'n 2, ECF No. 18 (discussing the Clifford case and its various complaints); Pls.' Sur-Reply 23, ECF No. 26 (referencing the original Clifford complaint).

[5] The Court may consider the state court decisions in the class action case. That class action is referenced and described in some detail in the Complaint, and purported deficiencies in that proceeding make up part of Plaintiffs' claims. See Compl. ¶¶ 46-53; see also In re Colonial Mortg. Bankers Corp., 324 F.3d 12, 16 (1st Cir. 2003) (looking to earlier proceeding for purposes of res judicata defense asserted in motion to dismiss where "the face of the complaint acknowledge[d] the existence of an earlier adversary proceeding"). Moreover, the settlement agreement and the term sheet used to summarize it are referenced throughout the Complaint and Plaintiff's briefing on the Motion to Dismiss. Compl. 38, 46, 48-53, 65, 68; Pls.' Opp'n 5-13, 16 n.7, 18-19, 30, 46-49; Pls.' Sur-Reply 2-5, 13-15, 18. These documents are thus "incorporated by reference in [the Complaint.]" In re Colonial Mortg. Bankers Corp., 324 F.3d at 20.

> ERSRI and all future employees, excepting only those individuals who on July 1, 2015, are participating in a municipal retirement system administered by ERSRI for municipal police officers in any municipality and/or for fire personnel of the City of Cranston.

R.I. Pub. Emples. Retiree Coal. v. Raimondo, No. PC 15-1468, 2015 WL 1872189, at *2 (R.I. Super. April 16, 2015) ("RIPERC I"). Every Plaintiff here was a member of that class. See Compl. ¶ 1. Furthermore, because the class was certified pursuant to Rule 23(b)(2) of the Rhode Island Superior Court Rules of Civil Procedure, class members did not have the ability to opt out. RIPERC II, 2015 WL 3648161, at *14 (citing DeCesare v. Lincoln Benefit Life Co., 852 A.2d 474, 490 (R.I. 2004)). A condition precedent of the agreement was the passage by the Rhode Island General Assembly of legislation set out in the agreement. See Settlement Agreement 5, ECF No. 10-12, at 10. The Superior Court summarized the legislation as follows:

> A one-time COLA payment of 2% applied to the first $25,000 of the pension benefit and that amount added to the base benefit will be paid to retirees (or their beneficiaries) who participate in a COLA program and who retired on or before June 30, 2012 as soon as administratively reasonable following the passage of the legislation based on the amount of benefit payable on the effective date of the legislation.

> For funds that are not already funded, the settlement shortens the time intervals between suspended COLA payments from once every five years to once every four years. The settlement also improves the COLA limitation for current retirees whose COLA is suspended. The settlement also requires a more favorable indexing of COLA Cap for all current and future retirees. The settlement also changes the COLA calculation to one more

likely to produce a positive number and dictates that the COLA formula will be calculated annually, regardless of funding level, and when paid, the COLA will be compounded for all receiving a COLA.

Current retirees (or their beneficiaries) who have or will have retired on or before June 30, 2015 will receive two payments: (1) a one-time $500.00 stipend (not added to the COLA base) within sixty days of the enactment of the legislation approving the terms of the settlement and (2) a one-time $500 stipend payable one year later.

For State Workers, Teachers, and General MERS, the settlement (1) adds another calculation to reduce the minimum retirement age; (2) improves the available accrual rate for employees with twenty years or more of service as of June 30, 2012; (3) requires increased contributions by the employer to the Defined Contribution Plan for employees with ten or more years of service (but less than twenty) as of June 30, 2012; (4) waives the administration fee for any employees participating in the Defined Contribution Plan who make $35,000 or less; and (5) adds another calculation designed to limit the impact of the "anti-spiking" rule imposed by the RIRSA on part-time employees.

For MERS Firefighters (excluding Cranston Firefighters), the settlement (1) lowers the age and service requirements for retirement; (2) increases the accrual rate for Firefighters who retire at age fifty-seven with thirty years of service.

For State Correctional Officers, the settlement increases the accrual rate for correctional officers with fewer than twenty-five years of service as of June 30, 2012.

The settlement reduces the impact of an early retirement.

The settlement allows Municipalities to "re-amortize"; that is, partially refinance, to be able to pay for the increased cost of the settlement.

Otherwise, the terms of the RIRSA remain the same.

RIPERC I, 2015 WL 1872189, at *3-4.  The agreement also provided that "each of the Parties covenant and agree that from and after the date hereof through and including final approval of the settlement and enactment of the Legislation and entry of judgment . . . [t]hey will not, directly or indirectly, propose, support, encourage or advocate for any legislative action concerning or relating to retirement benefits other than the adoption of the Legislation."  Settlement Agreement 6, ECF No. 10-12, at 11.

The court held a five-day fairness hearing, during which many objections were presented.  RIPERC II, 2015 WL 3648161, at *8-13. Following the hearing, the court rejected various contentions that the settlement was procedurally or substantively deficient.  Id. at *13-31.  The court approved the settlement, finding it to be "fair, adequate, and reasonable."  Id. at *31.  Shortly thereafter, the Rhode Island General Assembly passed the legislation contemplated by the settlement.  See R.I. Public Laws 2015, art. 141, ch. 21.  The court then entered judgment, stating:

> This Judgment is final and shall be binding on all parties and all class members in the above-referenced class action case for settlement purposes. Additionally, all class members are forever and completely barred from ever asserting any claims or causes of action that were alleged or brought or that could have been alleged or brought with respect to the various challenges to the Rhode Island pension statutes made and asserted in the above-captioned action and in each of the following matters, C.A. Nos. 10-2859, 12-3166, 12-3167, 12-3168, 12-3579, KC 14-0345, as the

> Court has previously found, determined and ruled that the terms and conditions of the Settlement Agreement, as now implemented and made effective by the Pension Legislation, are fair and reasonable.

R.I. Pub. Emples. Retiree Coal. v. Raimondo, No. PC 15-1468, 2015 WL 4501873, at *1 (R.I. Super. July 8, 2015) ("RIPERC III").   On the same date, the court also entered the following judgment in the Clifford case:  "The claims and defenses asserted herein having been foreclosed by the entry of Final Judgment entered in Rhode Island Public Employees' Retiree Coalition, et al. v. Raimondo, et al., CA. No. PC 15-1468, the complaint, as amended, is dismissed with prejudice."  Final J., Clifford v. Raimondo, No. KC 14-0345 (R.I. Super. July 8, 2015) (filed here as ECF No. 10-9).  Certain class members, including all Plaintiffs here, appealed both judgments to the Rhode Island Supreme Court.  See Clifford v. Raimondo, 184 A.3d 673 (R.I. 2018); Joint Notice of Appeal at 1-3, R.I. Pub. Emples. Retiree Coal. v. Raimondo, No. PC 15-1468 (R.I. Super. July 27, 2015) (listing all Plaintiffs here) (filed here as ECF No. 10-111).  In a consolidated opinion, the court affirmed the judgments in all respects, determining that the judge "did not abuse her discretion in concluding that the settlement was fair, reasonable, and adequate."  Clifford, 184 A.3d at 695 (citation omitted).

Two years later, Plaintiffs filed their Complaint in this Court, and Defendants responded with the instant Motion to Dismiss.

II.  DISCUSSION

Plaintiffs' Complaint alleges violations of the following provisions of the United States Constitution:  the Due Process Clauses of the Fifth and Fourteenth Amendments (Count I), the Contract Clause of Article I, Section 10 (Count II),[6] the Takings Clause of the Fifth Amendment (Count III), and the First Amendment's guarantees of freedom of speech and the right to petition the government (Count V).  Count IV, which is untitled, does not assert a separate cause of action and instead provides additional arguments to support Counts I, II, and III.[7]  Therefore, Count IV will not be considered separately from those Counts.

---

[6] Count II states that it is brought pursuant to Article 5, Section 10, which does not exist.  See Compl. 14.  Plaintiffs clearly intended to refer to Article I, Section 10, as evidenced by the unattributed quotation from that section in paragraph 59 of the Complaint.

[7] Count IV first alleges that "[t]he implementation against the interests of the Plaintiffs of this pension law is directly violative of the Plaintiffs' rights and privileges under the United States Constitution."  Compl. ¶ 66.  More specifically, the Count states that the 2015 law "constitutes a new law . . . and was not the subject of the [Clifford] case] or the onset or litigation of [the class action], but was the means to implement the Settlement Agreement."  Compl. ¶ 65.  This is Plaintiffs' exact argument for why Counts I to IV are distinct from the claims that were settled in the earlier cases.  See Pls.' Opp'n 15-16.  Second, the Count alleges that "Defendants have reasonable alternatives" to reducing Plaintiffs' COLAs.  Compl. ¶ 67.  To support this contention, paragraph 67 of the Complaint cites U.S. Tr. Co. of New York v. New Jersey, 431 U.S. 1, 31-32 (1977), in which the Supreme Court held that statutes that reduced the bond obligations of New Jersey and New York violated the Contract Clause, in part because less drastic alternatives were available to the states.  Again, this is

First, Defendants argue that Counts I to IV are based on the same set of facts (concerning RIRSA's reduction of COLAs) that were the subject of the state court class action, the Clifford action, and the Rhode Island Supreme Court decision, and are therefore barred by res judicata. Mot. to Dismiss 18-29. Second, Defendants contend that if the 2015 legislation is the basis for the lawsuit, Counts I to IV fail to allege an injury in fact because that legislation did not reduce Plaintiffs' pension benefits. Id. at 29-34. Third, Defendants maintain that, accepting Plaintiffs' dubious theory that the claims are based on the 2015 legislation (rather than RIRSA), all counts are barred by the Rooker-Feldman doctrine because they are an impermissible collateral attack on a final state court judgment. Id. at 34-38. The Court agrees with Defendants in all three respects and will therefore not address their other arguments for dismissal.

A.   Res Judicata

Res judicata (i.e., claim preclusion) "is a valid defense to a later suit if (1) there is a final judgment on the merits of an earlier action, and (2) there is identity of the parties and (3) identity of the claims in both suits." Reppert v. Marvin Lumber and Cedar Co., 359 F.3d 53, 56 (1st Cir. 2004) (citation omitted). This affirmative defense may be asserted in a motion to dismiss

---

simply an argument in support of another count, not a separate claim for relief.

for failure to state claim.  In re Colonial Mortg. Bankers Corp.,
324 F.3d 12, 16 (1st Cir. 2003) (citing Boateng v. InterAmerican
Univ., Inc., 210 F.3d 56, 60 (1st Cir. 2000)).  However, a
defendant can prevail at this embryonic stage only if the facts
supporting preclusion are "definitively ascertainable from the
allegations of the complaint, the documents (if any) incorporated
therein, matters of public record, and other matters of which the
court may take judicial notice."  In re Colonial Mortg. Bankers,
324 F.3d at 16.  "[A] court ordinarily may treat documents from
prior state court adjudications as public records."  Boateng, 210
F.3d at 60 (citing Henson v. CSC Credit Servs., 29 F.3d 280, 284
(7th Cir. 1994)).  Moreover, the facts contained within these
sources "must conclusively establish the affirmative
defense."  In re Colonial Mortg. Bankers, 324 F.3d at 16 (citation
omitted).

          i.  Final Judgment on the Merits of an Earlier Action

     Class action settlement agreements may form the basis for
preclusion.  Reppert, 359 F.3d at 56; see also Matsushita Elec.
Indus. Co. v. Epstein, 516 U.S. 367, 379 (1996) ("There is of
course no dispute that under elementary principles of prior
adjudication a judgment in a properly entertained class action is
binding on class members in any subsequent litigation." (citation
and quotations omitted)).  Here, the Rhode Island Superior Court
entered judgment in the class action and the Clifford case.  RIPERC

10

III, 2015 WL 4501873, at *1; Final J., Clifford v. Raimondo, No. KC 14-0345 (R.I. Super. July 8, 2015).  The Rhode Island Supreme Court affirmed, and Plaintiffs did not petition the United States Supreme Court for a writ of certiorari.  See Clifford, 184 A.3d at 695.  Thus, there was a final judgment on the merits.

Plaintiffs seem to argue that the settlement proceedings violated procedural due process and that the terms of the agreement violated substantive due process, so the Superior Court erred in certifying the class and approving the agreement.  See Pls.' Opp'n 31, ECF No. 18 ("Whether looked at from a substantive or procedural due process posture it is the case, that the State Defendants have reasonable alternatives which they have acknowledge [sic] in public for all the world to see and indeed endorse and fund.").  But the state courts' decisions to approve the settlement are themselves protected by res judicata.  See In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Products Liab. Litig., 431 F.3d 141, 146 (3d Cir. 2005) ("Once a court has decided that the due process protections did occur for a particular class member or group of class members, the issue may not be relitigated.").  The same is true for the certification of the class, which included Plaintiffs.  See Ticor Title Ins. Co. v. Brown, 511 U.S. 117, 121 (1994) ("It was conclusively determined in the [prior] litigation that respondents' class fit within Rules 23(b)(1)(A) and (b)(2); even though that determination may have been wrong, it is

conclusive upon these parties . . . ."); Juris v. Inamed Corp., 685 F.3d 1294, 1335 (11th Cir. 2012).[8]   Therefore, Plaintiffs cannot escape preclusion by arguing that the settlement should not have been approved or that they should have been allowed to opt out.[9]

Nonetheless, Plaintiffs attempt to do exactly that, pointing repeatedly to Andrews v. Lombardi, 231 A.3d 1108 (R.I. 2020).  See Pls.' Opp'n 11, 12 n.6, 22, 32-36, 42-43, 46, 51; Pls.' Sur-Reply 24-25, ECF No. 26.  In Andrews, Providence firefighters and police officers challenged a city ordinance that suspended their COLAs until the pension fund was seventy percent funded.  231 A.3d at 1113.  At summary judgment and following a bench trial, the Superior Court decided the constitutional claims in the defendants' favor.  Id.  The Rhode Island Supreme Court disagreed on the merits of the claims brought pursuant to the Contract Clauses of the United States and Rhode Island Constitutions, holding that the Superior Court "erred in finding that the length

---

[8] For this reason, Plaintiffs' reliance on Amchem Products, Inc. v. Windsor, 521 U.S. 591, 625 (1997), in which the Supreme Court reversed a district court's decision to certify a class, is misplaced.  See Pls.' Opp'n 28-29.

[9] Moreover, as discussed below, under the Rooker-Feldman doctrine this Court lacks authority to evaluate the merits of those state court determinations.

of time of the COLA suspension was reasonable and necessary to fulfill an important public purpose." Id. at 1126.

Plaintiffs do not explain how Andrews is relevant to the instant questions of res judicata and the Rooker-Feldman doctrine. Instead, Plaintiffs simply argue that since the plaintiffs in Andrews won, and since there are factual similarities between this case and that one, Plaintiffs here should win too. See Pls.' Opp'n 36 ("The Andrews Court found the contractual right was unfairly interfered with and remanded the case. No less a result can occur here."). Indeed, were this Court evaluating the merits of the underlying constitutional claims, Andrews might assist Plaintiffs. But the Court cannot reach the merits without first dealing with the obstacles of the prior actions.

From a related angle, Plaintiffs might be arguing that Andrews bolsters their underlying constitutional claims to such a degree that the settlement agreement, by providing piddling relief in response to RIRSA's devastating cuts, could not have been fair or reasonable. But, as explained, the fairness, adequacy, and reasonableness of the settlement are not for this Court to decide. Thus, Plaintiffs cannot sidestep res judicata by attacking the validity of the settlement. The first requirement – a final judgment on the merits in a previous action – is met.

ii.   Identity of the Parties

The second requirement of res judicata is identicality of the parties.  All 49 Plaintiffs here, along with the three Defendants, were parties to the Clifford case that was consolidated with the class action.  Fourth Am. Compl. at 4-22, Clifford v. Raimondo, No. KC 14-0345, (R.I. Super. Jan. 14, 2015).  All 49 Plaintiffs were members of the class certified in the class action, see Compl. ¶ 1, and Defendants here were the defendants there.  See Compl. at ¶¶ 28-30, R.I. Pub. Emples. Retiree Coal. v. Raimondo, No. PC 15-1468 (R.I. Super. April 13, 2015) (filed here as ECF No. 10-10).  All 49 Plaintiffs appealed the judgments in those cases to the Rhode Island Supreme Court.  See Joint Notice of Appeal at 1-3, R.I. Pub. Emples. Retiree Coal. v. Raimondo, No. PC 15-1468 (R.I. Super. July 27, 2015) (filed here as ECF No. 10-111).  Therefore, identicality of the parties is satisfied.

iii. Identity of the Claims

The third requirement is that the subject matter of the prior litigation and the current litigation be sufficiently similar.  The level of similarity that is required comes from Rhode Island law because, "[u]nder federal law, a state court judgment receives the same preclusive effect as it would receive under the law of the state in which it was rendered."  Dillon v. Select Portfolio Servicing, 630 F.3d 75, 80 (1st Cir. 2011) (citation omitted); accord Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75,

14

81 (1984).  In Rhode Island, a final judgment extinguishes "all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." Plunkett v. State, 869 A.2d 1185, 1188 (R.I. 2005) (quoting Restatement (Second) Judgments, § 24) (emphasis removed).  The definitions of "transaction" and "series" "are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." Id. at 1189 (quoting Restatement (Second) Judgments, § 24) (emphasis removed).

In the Clifford case, which was consolidated into the class action, the plaintiffs claimed that RIRSA unlawfully reduced retirees' pension benefits by denying them yearly, compounded, three-percent COLAs.   See Fourth Am. Compl. at ¶¶ 631-644, Clifford v. Raimondo, No. KC 14-0345 (R.I. Super. Jan. 14, 2015). The plaintiffs argued, inter alia, that RIRSA violated the Contract Clause, Takings Clause, and due process provisions of the Rhode Island Constitution.   Id. ¶¶ 649-672.  Clearly, if Plaintiffs' claims here are based on the fact that RIRSA reduced their COLAs, their claims arose out of the same transaction as the claims in the prior action.

15

In an attempt to escape the inevitable, Plaintiffs argue that their claims do not concern RIRSA, but rather the 2015 legislation spawned by the settlement agreement.  See, e.g., Compl. ¶¶ 22-26, 65; Pls.' Opp'n 1, 15-16.  However, Plaintiffs' filings belie this contention.  The illusory nature of their reliance on the 2015 legislation is well-summarized by the following passage from their Opposition:  "It is stark and unsupported assertion raised by the Defendant's [sic] to assert that the 2015 [sic] provides greater benefits than those striped [sic] away including unspecified host of other retirement benefits.  The fact is that the small payments made as part of the settlement failed to remotely compensate for the losses they were and continue to suffer as a result."  Pls.' Opp'n 10-11.  The same theory is articulated in Plaintiffs' Sur-Reply:  "The concept that the 2015 law only resulted in improved benefits is not born out by any fair reading of the statute.  The statute fails to restore to the Plaintiffs the COLA in the same compounded manner upon which they based their decision to retire."  Pls.' Sur-Reply 23.  In other words, RIRSA caused a constitutional harm by taking away Plaintiffs' pension benefits, and because the 2015 legislation restored their lost benefits only in small part, the 2015 legislation inflicted a second and separate injury to Plaintiffs.  But if the harmful attribute of the 2015 legislation is that it did not fix the injury caused by RIRSA, that is not a

separate cause of action.  It is merely a reframing of Plaintiffs'
RIRSA-based claims.

A plethora of examples from the Complaint make clear that the
injuries at issue were caused prior to the 2015 law.  See Compl.
¶ 1 ("The pension each Plaintiff was to receive in the time leading
up to their decision to leave public service included a cost-of-
living adjustment ("COLA") of 3% . . . ."); id. ¶ 32 ("State law
provided and the State promised all of the Plaintiffs, upon
retirement, a three-percent compounded cost-of-living retirement
adjustment . . . ."); id. ¶ 36 ("The Defendants did not, upon or
at any time prior to the Plaintiffs' retirement, represent to the
Plaintiffs that their respective Allowances and/or COLAs could or
would ever be reduced, suspended or eliminated . . . ."); id. ¶ 37
("Defendants, by and through their employees and/or agents,
calculated the projected COLA-adjusted pension payments retirees
could expect to receive as part of the retirement process."); id.
¶ 42 ("The suspension of the Plaintiffs' receipt of the COLAs,
pursuant to RIRSA, has substantially diminished, and continues to
substantially diminish, the amount of the Plaintiffs' respective
Allowances."); id. ¶ 55 ("Each of the Plaintiffs entered into an
agreement with the State with respect to the State's provision of
a mandatory, contributory and defined-benefit pension plan and/or
benefits, including, without limitation, the Allowance and COLA,
to each of the Plaintiffs, in exchange for Plaintiff's respective

17

performance of certain duties . . . ."); id. ¶ 56 ("The State breached the terms and conditions of the Agreement, including . . . those terms and conditions requiring the provision of a . . . COLA . . . .").

Moreover, the remedy sought by Plaintiffs is the reinstatement of the pension benefits and COLAs that were expected pre-RIRSA, along with compensatory damages for some or all of the years in which Plaintiffs have not received those full amounts. See Compl. 17 (praying that the Court "[d]eclare that Defendants' policies and practices implementing the legislation denying cost of living raises violates" due process, the Contract Clause, and the Takings Clause); Compl. 18 (praying that the Court "[t]emporarily, preliminarily and permanently enjoin Defendants from implementing the legislation identified herein denying Plaintiffs' cost of living increases in their pensions and honor the commitments made to the Plaintiffs prior to their retirements" and that the Court "[a]ward Plaintiffs compensatory damages for all prior periods affected by the implementation of 2015 Public laws of Rhode Island 141, Article 21, as the same existed at the time of the Plaintiffs' retirement"). These passages indicate that RIRSA is the basis for this case.

Plaintiffs thus try a slightly modified tack, arguing that the intervening event of the 2015 enactment was a rupture in the continuum of pension benefits and pension litigation such that

their claims were somehow born anew.  See Pls.' Opp'n 15-22.  To support this contention, Plaintiffs rely on the Supreme Court's decision in Whole Woman's Health v. Hellerstedt, 136 S. Ct. 2292 (2016), as revised (June 27, 2016).  The plaintiffs in Whole Woman's Health had previously challenged a Texas abortion restriction before the law went into effect.  See 136 S. Ct. at 2300.  They had lost because the Fifth Circuit determined that "[a]ll of the major Texas cities [would] continue to have multiple clinics where many physicians w[ould] have or obtain hospital admitting privileges . . . ."   Id. at 2306 (citation and quotations omitted)).  After the law went into effect, the plaintiffs sued once more, and the parties stipulated that the restrictions would lead to the closure of all but seven or eight clinics statewide.  Id. at 2316.  The Supreme Court noted that while the first action was a "facial challenge to the [law] prior to its enforcement - before many abortion clinics had closed and while it was still unclear how many clinics would be affected" - the second action was "an as-applied challenge to the requirement after its enforcement - and after a large number of clinics ha[d] in fact closed."  Id. at 2306.  Based on this intervening change in circumstances, the Court ruled that the second action was not barred by res judicata.  Id.

But while the constitutional claims in Whole Woman's Health were strengthened by the change in the factual landscape, here,

19

the 2015 legislation amounted to a partial restoration of Plaintiffs' benefits, thus weakening Plaintiffs' constitutional claims. As such, Whole Woman's Health gives no assistance to Plaintiffs.[10],[11]

For the purposes of this Motion, the Court fully accepts Plaintiffs' allegations that they were promised COLAs and that Defendants broke this promise. See Compl. ¶¶ 32, 42-43. Moreover, the Court does not doubt that the reduction in pension benefits has significantly impacted Plaintiffs' lives. But their opportunity to challenge the reduction in benefits caused by RIRSA "came and went" with the state court class action and subsequent appeal. See Plunkett, 869 A.2d at 1189. Plaintiffs' attempt to rest their claims on the 2015 legislation is merely a sleight of hand. Thus, Counts I to IV are barred by res judicata.

---

[10] In a similar, and equally futile argument, Plaintiffs seem to say that the 2015 legislation did two things: first, it repealed RIRSA, momentarily restoring the state of affairs prior to 2011, and second, it imposed new restrictions on pension benefits, thus robbing Plaintiffs of their briefly reincarnated COLAs. See Pls.' Sur-Reply 11 n.1. Whether or not RIRSA was repealed from a technical perspective, from a practical perspective Plaintiffs received more money after the 2015 legislation than they would have absent the legislation.

[11] Plaintiffs also raise a rather inscrutable argument suggesting that a challenge based on RIRSA would be moot, and Plaintiffs must therefore be permitted to challenge the 2015 legislation instead. See Pls.' Opp'n 30 (citing Gulf of Maine Fisherman's All. v. Daley, 292 F.3d 84, 88 (1st Cir. 2002)). This argument lacks merit.

B.   Injury in Fact

Defendants next insist that, were this Court to accept Plaintiffs' implausible theory that Counts I to IV are based on the 2015 legislation (and not RIRSA), those claims would fail to state an injury in fact.  See Mot. to Dismiss 29-34.  To establish standing under Article III, a plaintiff must plausibly plead an injury that is "both concrete and particularized and actual or imminent, not conjectural or hypothetical."  Hochendoner v. Genzyme Corp., 823 F.3d 724, 731 (1st Cir. 2016) (citations and quotations omitted).  Where injury in fact is lacking, there is no federal court jurisdiction.  Id. at 736.  In conducting this inquiry, the Court "takes all well-pleaded facts in the complaint as true and indulge[s] all reasonable inferences in [Plaintiffs'] favor to determine whether [they] plausibly pleaded facts necessary to demonstrate standing to bring the action."  Dantzler, Inc. v. Empresas Berrios Inventory and Operations, Inc., 958 F.3d 38, 46-47 (1st Cir. 2020) (quotations and citations omitted).

RIRSA reduced Plaintiffs' pension benefits.  See Compl. ¶¶ 39-45.  Despite the outcries of pension plan members, the class action settlement agreement and resulting legislation largely left those cuts in place.  However, the agreement led to a one-time, two-percent COLA, see R.I. Gen. Laws § 36-10-35(h)(1)(A), two 500-dollar payments to retirees, see id. § 36-10-35(i), and, for members of pension plans with less than eighty-percent funding,

21

the provision of COLAs every fourth year instead of every fifth.
See id. § 36-10-35(h)(3). To Plaintiffs, these small benefits, in
comparison to the significant cuts imposed by RIRSA, may have added
insult to injury. But the fact remains that the 2015 legislation
gave them more money, not less. Therefore, it is difficult to see
how the law harmed them.

Plaintiffs posit that they were injured because the term sheet
provided to class members as an explanation of the then-unfinalized
settlement agreement did not describe certain aspects of the
agreement that gave discretion to government officials in
determining COLA percentages and setting funding policies (thus
affecting when eighty-percent funding was achieved). See Compl.
¶¶ 38, 53; Pls.' Opp'n 47-48. Plaintiffs reason that this
discretion allows the state to underfund ERSRI, thus delaying the
provision of yearly COLAs. See Sur-Reply 5.

Specifically, Plaintiffs allege that three details were
absent from the term sheet. See Compl. ¶¶ 38, 53. First, the
term sheet stated that the COLA would be calculated based on a
five-year average investment return of the pension fund but did
not specify that the five-year average would be derived from the
investment returns as determined by the retirement board. Compare
Outline of Terms for Settlement Agreement ¶ I(B)(4), ECF No. 10-
12, at 73 ("COLA Formula [is] calculated using previous 5 year
average") with R.I. Gen. Laws § 36-10-35(h)(1)(B) ("The 'five-year

22

average investment return' shall mean the average of the investment returns of the most recent five (5) plan years as determined by the retirement board."). Second, Plaintiffs complain that the definition of "Funded Ratio",[12] which was made "subject to the 'funding policy' of the Retirement Board as defined in § 36-8-4," was similarly not described in the term sheet.[13] See R.I. Gen. Laws § 36-8-1(11). Importantly, these changes were included in the settlement agreement. See Proposed Act 4, Ex. C to Settlement Agreement, ECF No. 10-12, at 81 ("'Funded Ratio' shall mean the ratio of the actuarial value of assets to the actuarial accrued liability consistent with the funding policy of the retirement board as defined in § 36-8-4."); id. at 15, ECF No. 10-12, at 94 ("The 'Five-Year Average Investment Return' shall mean the average of the investment returns of the most recent five (5) plan years as determined by the retirement board.").

Of course, a "term sheet", designed to condense a lengthy settlement agreement into an easily understood format, will

---

[12] Plaintiffs use the term "Funded Rate", see Compl. ¶¶ 21, 53, but the correct term is "Funded Ratio". See R.I. Gen. Laws § 36-8-1(11).

[13] In their Opposition, Plaintiffs assert that this definition not only was absent from the term sheet, but was missing from the settlement agreement entirely. See Pls.' Opp'n 19. This assertion is incorrect. The definition did appear in the settlement agreement, identical to the text of the current law. See R.I. Gen. Laws § 36-8-1(11); Proposed Act 4, Ex. C to Settlement Agreement, ECF No. 10-12, at 81.

inevitably leave out various details of the full agreement.  That
is the point.  But, even if Plaintiffs are right, and the missing
details they highlight warranted inclusion in the term sheet, this
flaw is relevant only to the Superior Court's determination, as
affirmed by the Rhode Island Supreme Court, that the settlement
process did not violate the due process rights of the class
members.  This Court cannot review those determinations.

The third purported deficiency of the term sheet is that it
did not state that the following language would be stricken from
Rhode Island General Laws § 35-6-1:

> Upon issuance of the audited financial statement, the
> controller shall transfer all general revenues received
> in the completed fiscal year, net of transfer to state
> budget reserve and cash stabilization account as
> required by § 35-3-20, in excess of those estimates
> adopted for that year as contained in the final enacted
> budget to the employees' retirement system of the State
> of Rhode Island as defined in § 36-8-2.

See Compl. ¶ 38.  However, as Defendants point out, that change
was not part of the settlement agreement and therefore would not
have been included in the term sheet.  See Mot. to Dismiss 34 n.10.
Nor was that deletion part of the legislation that resulted from
the settlement – Rhode Island Public Laws chapter 141, article 21.
Rather, it was part of Rhode Island Public Laws chapter 141,
article 13, § 2.  Moreover, the Complaint makes no contention that

the change to § 35-6-1 violated the terms of the settlement.[14]
Thus, § 35-6-1 provides no support to Plaintiffs' arguments.

More broadly, Plaintiffs bemoan the fact that the settlement
agreement and implementing legislation gave discretion to the
government regarding the degree to which money was channeled into
the pension funds.   See Pls.' Opp'n 19-22; Compl. ¶¶ 60-63.
Plaintiffs argue persuasively that, because yearly COLAs will not
occur until the pension plans achieve eighty-percent funding,
Plaintiffs are unjustly subjected to the whims of those determining
fiscal policy for the state. See Pls.' Opp'n 22; Compl. ¶¶ 60-63.
However, by criticizing this discretion, Plaintiffs are simply
arguing that the settlement agreement was not fair.  As explained,
this Court has no power to re-adjudicate the propriety of the
settlement.

Lastly, Plaintiffs offer an actuarial chart that allegedly
shows that they have suffered monetary losses due to the 2015
legislation.   See Pls.' Opp'n 48 (citing Sherman Letter, ECF No.
18-1).  This chart purports to calculate "the difference between
what was paid to [a hypothetical average retiree] versus what would
have been paid but for the curtailment of the pension payments
under the Retirement Reform Legislation."  Sherman Letter 1, ECF

---

[14] In a sign that Plaintiffs may have recognized the deficiency
of this argument, Plaintiffs' briefing on the Motion to Dismiss
contains no reference to § 35-6-1.  See Pls.' Opp'n; Pls.' Sur-
Reply.

No. 18-1.  While the letter containing this chart does not define
"Retirement Reform Legislation", the letter makes clear that the
chart compares the hypothetical payments a retiree would have
received had neither RIRSA nor the 2015 legislation been passed to
the actual payments that were paid under the enacted legislation.
In other words, the letter illustrates that RIRSA resulted in
dramatically reduced payments, a proposition undisputed by
Defendants and irrelevant to the question of whether the 2015
legislation caused an injury.  The letter goes on to say that "the
special payments received do not make up [the] difference [caused
by the curtailment of COLAs,]" id., thus acknowledging that the
2015 legislation provided modest benefits to retirees.

     In sum, were the Court to accept Plaintiffs' argument that
Counts I to IV are brought based on the 2015 legislation, those
counts would fail to allege an injury in fact, and this court would
lack Article III jurisdiction.

     C.   Rooker-Feldman

     Even if Counts I to IV were based on the 2015 legislation,
and even if Plaintiffs had plausibly alleged that the 2015
legislation had injured them, this Court would lack jurisdiction
over those counts under the Rooker-Feldman doctrine.  That doctrine
also bars this Court from exerting jurisdiction over Count V, which
alleges that a covenant in the class action settlement agreement
unconstitutionally prohibited Plaintiffs from petitioning the

26

government for changes to the 2015 legislation prior to its passage.  See Compl. ¶ 68; Pls.' Opp'n 46-47.

The Rooker-Feldman doctrine bars federal district courts from entertaining "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."  Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280, 283-84 (2005) (citing Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923), and D.C. Ct. of Appeals v. Feldman, 460 U.S. 462 (1983)).  Such cases fall beyond a district court's subject-matter jurisdiction because, under 28 U.S.C. § 1257, the Supreme Court is the only federal court with the power to reverse or modify state court judgments.[15]  Exxon Mobil, 544 U.S. at 292.  The doctrine does not apply "unless, inter alia, the federal plaintiff seeks redress of an injury caused by an allegedly erroneous state court decision; if the plaintiff alleges a constitutional violation by an adverse party independent of the injury caused by the state court judgment, the doctrine does not bar jurisdiction."  Davison v. Gov't of Puerto Rico-Puerto Rico Firefighters Corps., 471 F.3d 220, 222-23 (1st Cir. 2006) (citing Exxon Mobil, 544 U.S. at 284).  As with any motion

_____

[15] This rule has certain exceptions, such as federal habeas review of state court criminal convictions.

to dismiss for lack of subject matter jurisdiction, the Court "accept[s] the [P]laintiffs' well-pleaded facts as true and indulg[es] all reasonable inferences" in their favor.  Id. at 222 (quoting McCloskey v. Mueller, 446 F.3d 262, 266 (1st Cir. 2006)).

Here, the Rhode Island Superior Court certified a class of plaintiffs, approved a settlement agreement that disposed of constitutional challenges to RIRSA (including Plaintiffs'), and overruled various objections.  A condition precedent of the settlement agreement was that the General Assembly would enact certain legislation, the provisions of which Plaintiffs now protest.  The purportedly unconstitutional sections identified in the Complaint were contained verbatim in the settlement agreement. See Compl. ¶¶ 21-25; Proposed Act 4, 16-18, 31-32, 43-45, Ex. C to Settlement Agreement, ECF No. 10-12, at 81, 93-95, 108-09, 120-122.  Were this Court to assess the constitutionality of the 2015 law vis-à-vis these Plaintiffs, this Court would be reviewing the decisions of the Rhode Island Supreme Court and Superior Court, precisely that which is forbidden under Rooker-Feldman.[16]

---

[16] Plaintiffs state that Massachusetts v. Wampanoag Tribe of Gay Head, 36 F. Supp. 3d 229 (D. Mass. 2014), "by inference . . . endorses federal jurisdiction with respect to a federal statute arising from a later enacted statute."  Pls' Opp'n 38.  That decision addressed whether there was a federal question; neither res judicata nor the Rooker-Feldman doctrine were at issue.  See Wampanoag Tribe of Gay Head, 36 F. Supp. 3d at 232-37.  Moreover, the cause of action in that case was triggered by a plethora of events that had occurred in the three decades since the settlement agreement was formed.  Id. at 231-32.  Here, as explained,

This prohibition applies even to Count V, which alleges that a covenant in the settlement agreement forbade Plaintiffs from lobbying the General Assembly while the 2015 legislation was pending, thus violating the First Amendment.  See Compl. ¶ 68.[17] The First Amendment issue was not discussed in the decisions from the Rhode Island Supreme Court and Superior Court; seemingly, the objection was not raised, or at least not emphasized.  See Clifford, 184 A.3d 673; RIPERC II, 2015 WL 3648161.  Nonetheless, the Rhode Island Superior Court entered judgment, ordering all members of the class to comply with the terms of the agreement. RIPERC III, 2015 WL 4501873, at *1.  The Rhode Island Supreme Court affirmed that judgment.  Clifford, 184 A.3d at 695.  Plaintiffs now ask this Court to hold that the covenant unconstitutionally restricted their right to petition the government.  See Compl. 18. In other words, Plaintiffs "seek[] redress of an injury caused by an allegedly erroneous state court decision . . . ."  Davison, 471 F.3d at 222.

---

Plaintiffs have not identified a single intervening event that comes anywhere close to establishing a cause of action.  Thus, the Court cannot identify any inferences helpful to Plaintiffs in the holding or reasoning of Wampanoag Tribe of Gay Head.

[17] It is not clear to the Court whether the covenant did in fact apply to Plaintiffs, who were not parties to the settlement agreement.  See Settlement Agreement, Ex. A, ECF No. 10-12, at 58-71.

This is not to say that once the Rhode Island Supreme Court has spoken on an issue this Court is forever barred from addressing the topic.  For example, were Plaintiffs to allege that an ongoing speech restriction in a settlement agreement was unconstitutional with regards to specific actions that Plaintiffs wished to take, a different result might obtain.  In that hypothetical situation, this Court would be faced with factual circumstances that were not before the state courts.  Thus, this Court could potentially reach the merits of the claim without impermissibly reviewing the state court decisions.  Here, conversely, Plaintiffs have brought an abstract First Amendment challenge, seeking a broad declaration that the covenant was unconstitutional.  See Compl. 17-18.  Entertaining the merits of that claim would inherently involve reviewing the state court judgments that approved the settlement agreement.  Thus, this Court lacks jurisdiction over Count V.[18]

_____

[18] The Court reaches no conclusions regarding the substantive merits of the First Amendment challenge.  To the extent that a court-enforced settlement agreement between state actors and private individuals restricts the First Amendment rights of class members who objected to that settlement, serious constitutional concerns are implicated.  See Overbey v. Mayor of Baltimore, 930 F.3d 215, 220, 222 (4th Cir. 2019) (holding that "strong public interests rooted in the First Amendment" rendered a non-disparagement clause in a settlement agreement from a prior police misconduct lawsuit "unenforceable and void"); Democratic Nat. Comm. v. Republican Nat. Comm., 673 F.3d 192, 204-05 (3d Cir. 2012) ("[C]ourts must 'indulge every reasonable presumption against waiver of fundamental constitutional rights.'" (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)); Davies v. Grossmont Union High Sch. Dist., 930 F.2d 1390, 1399-1400 (9th Cir. 1991) (holding that provision of settlement agreement between school district and

III. Conclusion

    For the reasons contained herein, Defendant's Motion to Dismiss, ECF No. 9, is GRANTED, and Plaintiffs' Complaint, ECF No. 1, is DISMISSED.

IT IS SO ORDERED.

_WESmith_
William E. Smith
District Judge
Date:  April 15, 2021

---

plaintiff barring plaintiff from running for school board was void where school district "failed to advance a public interest in enforcement of [the] waiver of [plaintiff's] right to seek and hold office sufficient to outweigh the public's interest in maintaining the full and fair right to vote").